and we'll hear argument in Asante v. California Dept. of Health Care Services. May it please the Court, I'm Tom Weiss and I'm here for the 19 plaintiffs here who are all what are called border hospitals within the meaning of the California State Plan Amendment 15-20. And I start by referring to that because as the panel is aware, there is a bit of history here to the department's deliberate discrimination against interstate commerce which in the course of this litigation the department made an attempt to remedy. And that the district court found essentially that they had gotten to second base but had not done sufficient to remedy the deliberate discrimination and therefore rendered a judgment which required elimination of the other aspects of discrimination that were identified and undisputed. I'd like to address mainly the hospital's appeal with respect to retrospective relief for the district court from July 1st, 2013 to the date of the court's order of December 21st, 2015. The main point that is at issue here is the function, purpose, and application of Section 1085 of the California Code of Civil Procedure which gives writ relief to people who by virtue of the action of the agency suffer an injury. And the court declined to give retrospective relief because of its interpretation of Section 1085, which was not an easy question, I must say, because the 1085 remedy has been used in very different circumstances. We've laid them out in our brief and the court referred to them in the court's order of April 2016 which addressed this issue. And the court agreed that, yes, the fact that there was discretion involved in the administration of the Medi-Cal plan itself does not mean that 1085 writ relief is unavailable. He went on then to consider how that could be done and whether it could be done without infringing illegally on the discretion of the agency. And he made distinctions between the case law that well establishes the use of 1085 writ relief to give monetary relief and distinguished them. And those cases included the Mission Hospital litigation and the things that spun off of that, including the case of the High Desert versus Douglas case in 2015, which in effect confirmed what the Mission Hospital cases had said somewhat indirectly. And by that I mean that the California court said, yes, the 1085 remedy includes damages under Section 1085, 10, excuse me, 1095 of the Code of Civil Procedure, which specifically refers to damages in an appropriate case. I'm sorry, it is a bit of a confusing case, but the district court made a decision in this case. That's correct. Could you address briefly what is wrong with the district court's decision? Only one thing. And that is that in the April 16 order, the court declined to impose retrospective relief on the same terms that it imposed prospective relief. And it did that because of its analysis of Section 1085. But so you think there's only one thing wrong with the order, but if in fact there was something else wrong with the district court's decision, such as its analysis of the Dormant Commerce Clause, we wouldn't be talking about what your issue is, correct? That's correct. I mean, in other words, that's the break point of the whole case. Well, right. Judge McKinney, if what you're saying is that if the court was wrong to find that discrimination, oh, well, then there's no issue. Then we're over. However, history of the prior children's hospital cases had established that there was discrimination under different — for different reasons under different plans. When you say those cases, are you talking about the State Court of Appeals? I'm talking about both the children's hospital cases, one of which was in the Ninth Circuit, one of which was in the Court of Appeal, California, in the 97 Calab Fourth case, the children's hospital case. And that's really what the district court looked at, correct? Well, that's correct. The court said that it found persuasive the approach of the children's hospital rebond to court. But in that case, there was retrospective relief granted. And so Judge Chen noted that and was not persuaded that this was the same kind of situation because he said, well, you know, this may be a little bit more complicated than simply saying, okay, stop discriminating, and then we know where the money goes. However — Do you take issue with the suggestion that Medi-Cal was acting as a market participant like any private entity? Oh, absolutely. And for the reasons that both Judge Chen and the Bonta Court, the children's hospital case found, and those — But I could ask you that because I am troubled by the, with all respect, the State Court of Appeals analysis here because it really doesn't track the Supreme Court. It kind of freelances on things the Supreme Court never said. So I'm not quite as sanguine about that case as perhaps the district court was. And I personally would look to the Supreme Court. So it would be helpful to me if you were to tell me what your position is, not under Bonta, which we're not bound by, but rather on the Supreme Court. I guess what I would say about that is there are a number of arguments that the Department made, but some of them I think — let me say it this way. The Department seems to say that if it isn't commerce, it's not discriminated against, and it's not commerce if it's regulation, and it's not interstate commerce. The Bonta Court pointed out, and Judge Chun agreed, that the definition of commerce is very, very broad. And, you know, you could go way back to Wickard v. Filburn and say this is commerce. There is a special aspect to this. The reason why — I think the simplest reason why the State is not a market participant is that it is part of a vast regulatory entitlement program for citizens who are defined in each State plan. And from the hospitals — Does it matter that the hospitals are not required to participate in Medicare? Now, that is really an interesting point, because as a practical matter, they are required, because — As a practical matter. Well, as a legal matter, too. It depends on certain circumstances. Let me give you an obvious example. When all these people were shot in Las Vegas a few weeks ago, there were about 250 people there who were California citizens. I'll bet you that a number of them were Medi-Cal beneficiaries, and they went to the local hospitals. There is no way that a hospital could say, oh, we don't have to treat you people in Entala. Well, but they have to. They have to under Federal law. Yes. Under Federal law. Exactly right. Yes, but it doesn't matter. Well, it matters because that's an obligation. The question here is, is the state regulating and coercing? You know, if we look to the Supreme Court language. And I take your point. I mean, of course the hospitals had to treat them, but that's a Federal regulation, is it not? Well, it's a Federal law, but states have comparable laws, and I'm not an expert on all of the 50 states' Entala models. But the point is, and I agree with that, that there's no legal compulsion on the part of the out-of-state hospitals to render emergency service. Well, there is one. That comes from the Federal government, doesn't it? Well, it comes from Entala, but it also comes in California, they would have to do it. In Nevada, I can't tell you with authority what the state law requires there, but yes. So let's take the case where we've got, you're using a Nevada example, we have out-of-state regulations that may require treatment in those states, and we have Federal regulations. But that kind of begs the question of whether the California system is a regulatory coercive system. So I'm still not quite sure what your answer is on that. Well, I think the answer is that there really is no option for the hospitals to stay out of the plan. That is, I think, the reason why, if someone were to say to you, can you identify any hospitals that don't participate in Medicare and Medicaid, who turn away Medicare and Medicaid? The answer will be, of course not. But what they do is they sign up and then they say, but you don't give me enough money. You know, we're here, we voluntarily signed up, but I don't really particularly love your reimbursement plan. But what makes them sign up? Well, they don't have to sign up to treat emergency care Medi-Cal patients. Of course not. Because if they're on the porch, they come in. I'm not sure. That's not an option. The point is, the States I don't think you're quite getting my point. And so I'm probably not articulating it well enough. And that is, we have the emergency treatment requirement. That's by law. But in terms of signing up to this program, what is it? As I understand it, there's no requirement, you say, for the hospital to sign up. It doesn't have to. They still have to treat. They might have to treat, but they don't have to sign up. It doesn't matter. If they're doing the treatment, they're in the business of providing the treatment to the patients. And by the way, when we talk about the emergency services, you might say that's not the tail, that's the dog. Because that's where the money is. That's where the resources are consumed. I'm sorry, Judge Fletcher. Yes. I was trying to just follow up on the point of Judge McKeown. The compulsion to treat comes under Federal law, not State law. Is that accurate? No. I mean, it is accurate that it comes under Federal law, but it is not accurate that it doesn't come under State law, at least as far as California is concerned. Well, what California State law compels the out-of-State hospitals to render treatment to its Medicare citizens? No, that would be determined by the local State... Out-of-State law. The local out-of-State law. That would be determinative. But I don't think that that exempts the Department as a market participant. Because I think even to say market is a misnomer, because this isn't a market, this is a highly regulated service, which these hospitals have really no option but to accept, comply with, and participate in. The people who live on the border live in Reno or patronize the Washoe Hospital there, which is also named as Renown, just don't have that choice. All right. I think we have your point in mind. You're down to almost no time, and I'll give you some rebuttal. Thank you. May it please the Court. I'm Joshua Sonheimer on behalf of the Department of Health Care Services, California, and its Director, Jennifer Kent, named in her official capacity. Your Honors, the Court need not and should not reach the questions of the application of the Dormant Commerce Clause and the remedial orders of the District Court because as a threshold matter, the Department was acting here in setting reimbursement rates Like a market participant? As a market participant, yes, Your Honor. How? Because under the standards articulated by the Supreme Court, first of all, its conduct is analogous to that of a private entity. In particular, as we've demonstrated and identified in our papers, private insurers such as Aetna or Blue Cross do establish fixed rates at which providers may agree or not agree to abide by for serving enrollees in that health plan. And that's exactly what the Department is doing here. I think his point is, although he didn't mention the case, but I hear Mr. Weiss's point as being that what you have here as a practical matter is really the functional equivalent of regulation. And you could go back to, is it Wanneke? In the Supreme Court, where I realize it's a plurality and it's kind of hard to unscramble some of these Supreme Court decisions, but isn't what's happening here because of the reality is that there's the functional equivalent of regulation? No, Your Honor. The Department's establishment of payment terms for inpatient hospital services does not regulate the prices that an insurer must pay or that a hospital may charge for those same services provided to someone who has private insurance or someone who has no insurance at all. So there are no, as some of the cases put it, no downstream or spillover effects. These, the Department's terms for medical payments for Medi-Cal covered services are cabined, are restricted to services provided, covered services provided to Medi-Cal beneficiaries only. So, I mean, I suppose the State could just quit this, right? Could quit Medi-Cal, could they? Your Honor, the State could, absolutely. And then Mr. Weiss's clients would be, well, they'd still have to provide emergency services under out-of-state law and federal law for the indigent services, correct? If Medi-Cal just evaporated. Correct. Presumably, many of those individuals would have no insurance. State payment would simply not be involved. And Medi-Cal absolutely is a voluntary program on the part of the States. All States do currently participate in the program, but it is voluntary. So the strength of your argument is that Medi-Cal is not a market participant? I'm sorry, Your Honor, the strength of your argument is that Medi-Cal is not a market participant, basically? The Department in setting, to be specific, Your Honor, the Department in its conduct of establishing terms of payment for inpatient hospital services provided to Medi-Cal beneficiaries, indeed, is acting as a market participant. You're saying they're acting as any other insurer setting rates, and your view is they're not? I'm sorry. They're not acting in a sovereign capacity, a regulatory capacity? Thank you, Your Honor. That's correct. Of course, any case involving the Dormant Commerce Clause and where the question of the State or a government entity acting as a market participant, of course, is acting in its governmental capacity, in that respect, in a sovereign capacity. Like, I suppose, any health care provider acts as a market participant. Correct. But our point is that the conduct of the Department in this instance is exactly analogous to that of a private health plan seeking to set rates that are sufficient to enlist a sufficient number of providers to provide care to enrollees, as the State is required by Medicaid law to do. Is it the case that the rates that are set for the out-of-State hospitals are higher than the rates that are set for the in-State hospitals? And if so, does that make a difference? Are the rates higher? Do the out-of-State hospitals have to pay more for the same services than the services in-State? Your Honor, I think I'm having a little bit of trouble with your question. Any disparity in the amounts that the out-of-State hospitals have to pay versus the in-State hospitals for the same service? Well, you're referring to that the hospitals pay. The State is the payor in this instance. I'm sorry. I got it. Yes, yes, you're right. The State is the payor in this instance. Out-of-State, the border hospitals at issue in this case are the effect of taking into consideration wage differences between areas. Does result in some differences in the wage index that's applied to payment terms and so does result in a differential between payments to in-State and out-of-State hospitals. But the basis of that is not the location of the hospital specifically. The basis is, in fact, the Department's effort, just like the Federal Medicare program, to take into account real differences in wages between areas. And the Medicaid Act requires under 42 U.S.C. 1396A30A, as we've identified in our papers, requires the State to take into account factors of efficiency and economy in setting rates. And the Department was directed by the State legislature to consider whether, in fact, in meeting that mandate, it should consider whether to adjust payment rates based on wage differences. And as we've identified in the case of California. But there could be wage differences within California as well. Absolutely, Your Honor. I mean, there's some small town is different than Los Angeles. So the same result occurs, right? That's correct. Absolutely. A hospital in San Francisco or Santa Cruz was identified in the study conducted by the Department's contractor of this issue, had much higher wage costs in that area than hospitals in rural areas. And therefore, the Department deemed it appropriate, specifically looking at California itself, to use the Medicare wage index to adjust prices to ensure that hospitals with presumably higher, in areas that have higher wage costs, are reimbursed at a rate sufficient to enlist enough providers. And conversely, where wage rates are lower, to ensure that the rates paid are not inflated, essentially, too high. But it doesn't matter here that the State is essentially the only participant in this market, correct, for providing health coverage to Medi-Cal beneficiaries? Your Honor. Is that true? Do I understand that correctly? I don't think that's correct, Your Honor. All right. And as we've identified in our papers, the Department is seeking services for its enrollees. And as required by the Medicaid Act, it's required to set its rates at rates that are sufficient to attract enough providers so that beneficiaries have access, equal access to services in different geographic areas. But there's only one person, entity, doing that. That's the State doing that. And then it's looking for different, and it has different beneficiaries, individuals who are in these hospitals that he's representing. They only have one place to get their Medi-Cal reimbursement, right? Which is the State? If I'm understanding your question, Your Honor, yes. The hospitals, if they choose to enroll, and, of course, it's voluntary, if they choose to enroll in the Medi-Cal program, they make a claim to the Department for reimbursement. So the only place they can get their reimbursement is from the Department. It's a centralized entity. Yes, but, Your Honor, the State is purchasing medical services. It's seeking to enlist providers in the broader health care service market. And we think that that's the appropriate way to look at the market. Yes, it's the. I suppose the same is true throughout the country. In other words, if it's federal regulations that apply here, if citizens, let's say, of the eastern part of California go into Nevada and get injured, Medicaid-eligible persons, then Nevada sets certain rates, and they're required to render service. Is that fairly accurate? In other words, California residents have the same rights that Nevada residents have coming into California, vice versa. Absolutely. If a Nevada resident happens to be in California and is injured or lives near the border, and for one reason or another, for non-emergency services, it's customary to receive services in California, absolutely. It's complementary that the Nevada resident can get the services in California. The same system occurs throughout the country, doesn't it, since we're talking about federal regulations in terms of reimbursement for Medicaid services? Yes, Your Honor. Okay. I think what Mr. Weiss is saying is kind of a gun to your head here because there's only, I mean, it would be, of course, financial suicide to say, oh, we'll just eschew the California system and not sign up for that, because then we'd get zero from that, right? And so it's that you have no choice, really, realistically, as a business matter that makes it coercive. But I don't think that's correct, Your Honor, because, first of all, there are private hospitals that choose not to participate in the Medicare or Medi-Cal programs. They're relatively rare, but they do. Right. I mean, there are so many small private surgery and other centers that, for economic purposes, decide not to do this. And even the obligation under the EMTLA, as it's referred to, is an obligation to serve emergency patients, is an obligation that's voluntarily undertaken by a hospital by choosing to enroll in the Medicare program. It's not coercive, Your Honor, because it's — plaintiffs want the Court to focus solely on the service to Medi-Cal patients. But the obligation to serve emergency patients who come to the door for emergency services applies regardless of whether that patient is from Medi-Cal or not. They have to serve that patient. It's a federal and a state law. Correct. And they have to serve a patient whether they have — if they have no insurance or if they have private insurance. So it's not — it's not — it's just simply not related to the Medi-Cal program. In your view, it's really unhinged from the Dormant Commerce Clause analysis, the fact that they have to serve these patients that show up on the doorstep. Yes, Your Honor. It's a classic red herring. Do the Nevada hospitals have the option of not accepting Medicare enrollees from California? Yes, Your Honor. As a legal matter, participation in Medi-Cal is voluntary. So a Nevada hospital, Arizona hospital, Oregon may choose not to enroll as a provider in the Medi-Cal program and receive the payment that Medi-Cal receives. Now, as a practical matter, it may be that they need to seek any sources of reimbursement for that covered service, and so it may behoove them to enroll. However, as a legal matter, they are not required to. It is voluntary. Their complaint, of course, is the level of reimbursement, correct, ultimately, which translates into money. Yes, I think the concern is the level of reimbursement, but the — But they know beforehand that they have to pay as requested by the State of California, right? They voluntarily provide the service. They can choose not to provide the service. If it's a non-emergency service, the hospital does not have to provide the services to a Medi-Cal employee. Emergency services, they have to, right. Okay. Correct. I think fundamentally, the Court can also look to the standards articulated in market participant cases where preemption is involved. We've pointed out this Court's recent decision in the Airline Service Providers Association case. They're the — a very similar type of analysis. The Court looks to whether the government entity is pursuing the efficient procurement of needed services, and the scope of the regulation has a narrow scope that defeats any suggestion that it's seeking to impose a general policy. That's exactly the circumstance here. As I've articulated, the Department is simply seeking to procure hospital services for enrollees in the Medi-Cal program, and the rates do not govern in any way the rates that a private insurer must pay for the same service or that a hospital may charge for the same service if it's not provided to a Medi-Cal enrollee outside of the Medi-Cal program. Mr. Weiss referred to the Medi-Cal program as being a vast government program. I think that's one of the things that — a factor that has influenced courts such as the children — the decision of the court of appeals and some other courts to see this as a government function. But the analysis is really no different if this were, for example, a small State such as South Dakota that is not as large as California. What is really going on is the Department is acting just like the Medi-Cal program of South Dakota or another small State. But we wouldn't have a dormant Commerce Clause issue if there weren't a State involved to begin with in some kind of business. That's kind of inevitable that we'd be — we'd have to have a State to be talking about this. That's correct. And this Court's decision in Big Country Foods, which we talked about in our papers, made clear that just because the State is acting in some capacity fulfilling a government function does not take it outside of the realm of the market participant exception. That would allow the exception to swallow the rule. When the courts have looked at whether a government entity is serving in a sovereign capacity, it's — it's — where it's undertaking quintessentially governmental functions such as, you know, taxation or this — this type of thing, obviously that's not the case here. We've got a modern regulatory program that the State has voluntarily agreed to — to undertake to provide health insurance for those California residents who are unable to afford private insurance. Thank you. Thank you, Your Honor. Could you put a minute back on his clock, please? Your Honor, in our response brief — reply and response brief at page 24, we have cited and quoted from each of the border State statutes that are what you might call little entala, that impose on these border hospitals the obligation to treat emergency patients who are Medi-Cal beneficiaries when they need it, such as the example I gave. And the fact is these are services that are provided by legal compulsion, which if they were across the border, they would be paid a significantly larger allowance for the expense of treating these patients. But it is a Federal legal compulsion, isn't it? No, there are imposition of the States of Nevada, Oregon, and Arizona. But your client could choose not to enroll, could it not? No. No. I'm not saying not to treat. I'm saying not to participate in the California — Well, they are participating if they treat. But that's voluntary. No, it isn't. But they're not participating — they're participating because of a State and Federal law. Correct. Not because of insurance. And because they are hospitals. Okay, thank you. I appreciate your — I think we have well in mind the quite opposing arguments on both sides here, so we appreciate the argument on both sides. The case of Asante versus the Department of Health Care is submitted. Thank you. We are adjourned for the morning.
judges: Fuentes, Fernandez, McKeown